**2021 WI 73**

# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2020AP1028-J |

| | |
|---|---|
| COMPLETE TITLE: | In the Matter of the Judicial Disciplinary Proceedings Against Scott C. Woldt:<br><br>Wisconsin Judicial Commission,<br>           Complainant,<br>       v.<br>The Honorable Scott C. Woldt,<br>           Respondent. |

DISCIPLINARY PROCEEDINGS AGAINST WOLDT

| | |
|---|---|
| OPINION FILED: | July 13, 2021 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | |
| COUNTY: | |
| JUDGE: | |

JUSTICES:

Per Curiam. REBECCA GRASSL BRADLEY, J., concurs in part and dissents in part, in which ROGGENSACK, J., joined.
NOT PARTICIPATING:
ZIEGLER, C.J., and HAGGEDORN, J.

ATTORNEYS:

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2020AP1028-J

STATE OF WISCONSIN      :      IN SUPREME COURT

**In the Matter of the Judicial Disciplinary Proceedings Against Scott C. Woldt:**

**Wisconsin Judicial Commission,**

      **Complainant,**

    **v.**

**The Honorable Scott C. Woldt,**

      **Respondent.**

**FILED**

**JUL 13, 2021**

Sheila T. Reiff
Clerk of Supreme Court

JUDICIAL disciplinary proceeding. *Judge suspended from office.*

¶1 PER CURIAM. We review, pursuant to Wis. Stat. § 757.91 (2019-20),[1] a Judicial Conduct Panel's[2] (the Panel)

---

[1] All subsequent references to the Wisconsin Statutes are to the 2019-20 version unless otherwise indicated. Wisconsin Stat. § 757.91 provides:

> The supreme court shall review the findings of fact, conclusions of law and recommendations under s. 757.89 and determine appropriate discipline in cases of misconduct and appropriate action in cases of permanent disability. The rules of the supreme court applicable to civil cases in the supreme court govern the review proceedings under this section.

findings of fact, conclusions of law, and recommendation for discipline for the Honorable Scott C. Woldt, a judge for the Winnebago County circuit court. In a Joint Stipulation as to Findings of Fact and Conclusions of Law (the Joint Stipulation), Judge Woldt admitted to all of the facts in the Wisconsin Judicial Commission's (the Commission) complaint and agreed that, based on those facts, he had violated the Code of Judicial Conduct (the Code). Based on the Joint Stipulation, the Panel found that the facts alleged in the complaint were established as true and determined that those facts supported the legal conclusion that Judge Woldt had willfully violated several rules of the Code, which constituted judicial misconduct under Wis. Stat. § 757.81(4)(a).[3] After receiving memoranda from the parties regarding the appropriate level of discipline, the Panel recommended that this court suspend Judge Woldt without pay for a period of not less than seven nor more than 21 days.

¶2 After carefully reviewing this matter, we adopt the Panel's findings of fact, and we agree that those facts demonstrate that Judge Woldt committed judicial misconduct. We conclude that as discipline for that misconduct, Judge Woldt

---

[2] Pursuant to Wis. Stat. § 757.87(3), Judges JoAnne F. Kloppenburg, Thomas M. Hruz, and Mark A. Seidl of the court of appeals were appointed to serve as the Judicial Conduct Panel, with Judge Kloppenburg acting as the presiding judge.

[3] Wisconsin Stat. § 757.81(4)(a) states that judicial misconduct includes "[w]illful violation of a rule of the code of judicial ethics."

should be suspended without pay for a period of seven days, commencing August 2, 2021.

¶3 Judge Woldt has been a circuit court judge since his appointment to the bench in 2004. He was subsequently elected to six-year terms in 2005, 2011, and 2017. He has never before been the subject of public or private judicial discipline.

¶4 On June 17, 2020, the Commission filed a complaint in this court against Judge Woldt alleging that he had willfully violated Supreme Court Rules (SCRs) 60.02, 60.03(1), 60.04(1)(d), and 60.04(1)(hm) in connection with six separate incidents. At the same time that it filed its complaint, the Commission also filed the Joint Stipulation, in which Judge Woldt not only agreed that the factual allegations in the Commission's complaint were true, but also that those facts demonstrated that his conduct in each of the six incidents described in the complaint "violated the Code of Judicial Conduct" with respect to the particular provisions of the Code set forth in the complaint. Joint Stipulation ¶¶3 and 15. The parties jointly requested that they be permitted to submit memoranda to the Panel with respect to the issue of the proper level of discipline.

¶5 After the appointment of its members, the Panel established a briefing schedule for the submission of memoranda regarding the appropriate level of discipline. Judge Woldt subsequently requested that the Panel hear oral argument in this matter, which the Commission opposed. The Panel denied Judge Woldt's request, concluding that oral argument was unnecessary

3

in this matter in light of the stipulated nature of the facts and the legal conclusions of violations of the Code.

## I. FINDINGS OF FACT AND CONCLUSIONS OF LAW

¶6 We now turn to the facts and legal conclusions as stipulated by the parties and as found by the Panel. Both the complaint and the Panel's report numbered and addressed the six incidents at issue in this proceeding in reverse chronological order. We maintain the numbering system used by the complaint and the Panel's report to avoid confusion, but we address them in chronological order to demonstrate the continuity of Judge Woldt's behavior over an extended period of time.

### Incident Six (February 27, 2009)

¶7 The first incident at issue in this proceeding occurred during a sentencing hearing that took place on February 27, 2009, in State v. Williams, Winnebago County Case No. 2008CM1517. The criminal charges in that case resulted from an altercation between Williams and his girlfriend. Williams pled guilty to one count of disorderly conduct as an act of domestic abuse. A second charge that also related to domestic abuse was dismissed and read in for sentencing purposes.

¶8 At the beginning of the sentencing hearing, the victim made the following statement: "I was just hoping that he could get a fine and community service instead of 18 months' probation because we are trying to work things out and things have been a lot better." During the hearing Judge Woldt asked questions of the defendant that clearly conveyed he did not believe the defendant. He then stated that "[t]he answers to my questions

4

clearly tell me that you need counseling, plain and simple." Judge Woldt then imposed and stayed a 30-day jail sentence and placed Williams on probation for one year with a number of conditions. After concluding his sentence of Williams, Judge Woldt addressed the following comments to the victim:

> And ma'am, if you come in here and tell me that you just want a fine, everything's fine, then don't pick up the phone and dial 911, don't call the cops. I mean if you think you want to handle it, then you handle it; but if you want to pick up the phone and call the police, we're going to get involved and we're going to make him get the counseling which he needs. I'm just sick and tired of victims coming in here and they call the cops when they need 'em but then later on they come and say: Oh, no, this person's an angel. I'm sick and tired of hearing it.

¶9 The Commission's complaint alleged that Judge Woldt's comments to the victim had violated the Code. The Panel agreed that Judge Woldt's statement to the victim had constituted willful violations of three SCRs: SCR 60.02,[4] SCR 60.03(1),[5] and SCR 60.04(1)(d).[6]

---

[4] SCR 60.02 provides:

> An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining and enforcing high standards of conduct and shall personally observe those standards so that the integrity and independence of the judiciary will be preserved. This chapter applies to every aspect of judicial behavior except purely legal decisions. Legal decisions made in the course of judicial duty on the record are subject solely to judicial review.

**Incident Five (May 29, 2015)**

¶10 Judge Woldt presided over a sentencing hearing in State v. Krebs, Winnebago County Case No. 2014CF466. Krebs, who was 18 years old at the time of the crime, pled no-contest to one count of second-degree sexual assault of a 13-year-old girl. Krebs was asked by another young man to take him to a small gathering to see the young man's girlfriend. There were a couple of other younger girls also present at this outdoor gathering. According to the criminal complaint, Krebs and one of the younger girls were kissing. Krebs then put his hand into the girl's shorts, penetrated her vagina with his finger, and tried to push her head down toward his penis.

¶11 During the sentencing hearing, defense counsel tried to explain Krebs' state of mind and to portray him as a young

---

[5] SCR 60.03(1) provides: "A judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary."

[6] SCR 60.04(1)(d) provides:

> A judge shall be patient, dignified and courteous to litigants, jurors, witnesses, lawyers and others with whom the judge deals in an official capacity and shall require similar conduct of lawyers, staff, court officials and others subject to the judge's direction and control. During trials and hearings, a judge shall act so that the judge's attitude, manner or tone toward counsel or witnesses does not prevent the proper presentation of the cause or the ascertainment of the truth. A judge may properly intervene if the judge considers it necessary to clarify a point or expedite the proceedings.

man who was confused and afraid due to the situation (kissing a girl), didn't really know what he should do, and got caught up in the moment, as opposed to an experienced man who sought out a young victim in a predatory fashion. Judge Woldt interrupted defense counsel with the following exchange:

> The Court: I know when I'm paralyzed by fear the first thing I want to do is stick my "dick" in some girl's mouth.
>
> Mr. Edelstein: Well –
>
> The Court: Everyone else the same way? (No response.)
>
> The Court: I mean that's a stupid argument.
>
> . . .
>
> Mr. Edelstein: I'm not saying it wasn't a two-way street, but it's not as if we have an individual who set out in a predatory fashion to meet up with someone knowing that his friend was going to a party with these young girls here. That's not what happened.

¶12 Later in the hearing, after telling defense counsel to "jump to the chase," Judge Woldt asked Krebs if he had anything to say (in allocution). Krebs paused, and before he could get any words out, Judge Woldt jumped back in with the following exchange:

> The Court: Here's the deal. People who practice in front of me a lot know that I don't like being late. That's why all these signs around here say, "Don't be sorry, be on time." I don't like being late. And attorneys that practice in front of me a lot know, that when things are getting behind, they know the best thing they can do is to shut their "pie holes" and get to the point, and Mr. Edelstein doesn't get that. But I understand he has – feels that he has to say what he has to say on behalf of his client and get

7

the best deal. So what I always say to people is, "Is there anything you want to do to mess this deal up? Is there anything you want to say?"

The Defendant: No.

The Court: You're a very smart man. You would be amazed at the amount of defendants that come in and say, "Yeah, there is," and then they continue to go on.

I don't think for a minute that you're the type of kid that's going to come back here. You're a low risk to reoffend. Everything in the PSI says you're a low risk to reoffend. I think you got into a situation where you were taken advantage of and you returned the favor by taking advantage of someone else. What tells me a lot is the fact that the victims in this case had no contact whatsoever with return phone calls to the agent. That tells me that there's something with this so-called victim in this case.

¶13 The Commission alleged, and the Panel found, that Judge Woldt's comments and behavior during this sentencing hearing had constituted willful violations of the following four provisions of the Code: SCR 60.02, SCR 60.03(1), SCR 60.04(1)(d), and SCR 60.04(1)(hm).[7]

---

[7] Judge Woldt's comment to the defendant discouraging him from exercising his right of allocution violated this rule. SCR 60.04(1)(hm) provides:

A judge shall uphold and apply the law and shall perform all duties of judicial office fairly and impartially. A judge shall also afford to every person who has a legal interest in a proceeding, or to that person's lawyer, the right to be heard according to the law. A judge may make reasonable efforts, consistent with the law and court rules, to facilitate the ability of all litigants, including self-represented litigants, to be fairly heard.

8

**Incident Four (June 4, 2015)**

¶14  This incident occurred during a postconviction motion hearing in <u>State v. Grant</u>, Winnebago County Case No. 2014CT413, in which the defendant argued that his trial counsel had provided ineffective assistance by failing to file a motion to suppress evidence.  After hearing testimony from trial counsel, Judge Woldt denied the motion.  He then added the following comments:

> The Court:  . . . I would have denied the motion in the first place if Mr. Szilagyi would have followed – filed it and I probably would have done so forcefully, not that I wouldn't like to grant this motion because I really would.  I would love to grant this motion, I would love to have a trial on this issue, I'd love that he get found guilty, and I'd love to give him a year in jail for wasting my time today.  I would love to do that, but unfortunately I can't. . . .

¶15  The Panel found that this comment had constituted a willful violation of the following provisions of the Code: SCR 60.02, SCR 60.03(1), and SCR 60.04(1)(d).

**Incident Three (June 5, 2015)**

¶16  This incident occurred during a sentencing hearing in <u>State v. Shaffer</u>, Winnebago County Case No. 2014CF509.  In that case the defendant was charged with burglary of a neighbor family's house and with stalking (with a previous conviction for a violent crime).  Pursuant to a plea agreement, the defendant pled no contest to the stalking charge, and the burglary charge was dismissed and read in.

¶17  The defendant, who was then in his mid-20s and suffered from substantial cognitive deficiencies, removed the

garage door opener from the neighbors' car and used the opener on a subsequent date to enter the neighbors' house. He took some of the wife's underwear, which he later returned, along with the opener. The defendant had a previous conviction in 2009 for sexual contact with two seven-year-old girls who were in his mother's daycare business.

¶18 At the sentencing hearing, the husband victim spoke about how the defendant's actions had undermined the family's sense of safety in their home, especially in light of the fact that they had two young children.

¶19 During his subsequent sentencing comments, Judge Woldt told the husband and wife victims that he understood their fear as a result of the defendant's actions. He then proceeded to give a rather lengthy soliloquy about his views on courthouse security before returning to what an appropriate sentence should be. We include an extended excerpt of Judge Woldt's comments below because it is important to understand the full context:

> By the same token, I understand the fear of the victims in this case. When I judge people and I make decisions, the people of this county elected me, and when they elected me they elected me and my beliefs, my thoughts, and they reelected me because they agree with my beliefs and my thoughts and my experiences. Just an example is I've been trying to get security into this courthouse. There is none. Any one of you could have walked in today with a gun. None of us would ever know. Because I sit here and I – this isn't the most safest place in the world, I don't deal with the upper echelon of the community, a lot of people I meet do pretty bad things, I send people to prison – or I should say they send themselves to prison but they think I do – so I have a concern with that. So I have that fear too. So what can I tell

10

you to do with that fear?  I have tried the County Board, I have tried everything to get people to do something to keep guns out of this courthouse, and nothing happens, so you know, you got to protect yourself.  I can tell you what I do now.  This is what I do – (the court holds up a gun.)  That I keep up here on the bench just because I want to protect myself.  Now, I'm not saying you should do that but if I was in your – if I was in your situation, I'd have it on my side all the time.  With today's laws with the *Castle Doctrine*, you're lucky you're not dead because, if you would have come into my house, I keep my gun with me and you'd be dead, plain and simple, but that's what makes this so scary.  So –

And everyone says I can't believe this happened, it's not like him, that's not like him.  I get one letter from Attorney Reff, and I'm reading the letter, and it just boggles my mind.  He's a nice kid.  He won't do this.  Don't put him on probation because he doesn't do well on probation because he doesn't like telling – people telling him what to do and it's just not going to do him any good.  Don't put him in prison because prison is for bad people, [and] he's not a bad person, it's not going to do him any good.  Well, then what the hell am I supposed to do?  Just say – (the court swishes hands together) – I give up, nothing, because probation's not going to work, he doesn't listen to anybody, prison's not going to work because that's only for bad people, he's not a bad person.

So I agree, what do you do?  Everyone today was saying who knows, who knows what to do.  I think even the people that were talking on [the defendant's] behalf, who knows, said it twice, who knows, who knows.  Who knows what to do with him?  If no one knows what to do with him, the only thing I can do is judge his past, what he's done in the past, the fact that we tried to help him and he continues to do that, so that I have to take as the Gospel, that's the way it's done, so the only thing I can do at this point is look at one thing, and that's protection of the public, so what can I do to protect the public from him because he's not going to change, and that's incarceration.  That's the only thing I can do is take him out of society by doing it, but I can also do some things also to hopefully make the victims feel more at ease 'cuz I

11

agree with you with respect – I agree – I agree with you, partly because I am an idealist also. Damn it, it's my house. It's my first house, and I don't want to move. Why should I have to move if I haven't done anything wrong? I understand that, but I also understand that I don't give a shit about my idealistic beliefs, if it comes down to my family's safety I'm moving my ass out of there. It goes both ways.

¶20 This excerpt indicates that at one point during his lengthy statement, Judge Woldt held up a handgun. The Commission's complaint alleged, and the Panel found, that during the hearing, Judge Woldt had a Glock Model 43 handgun in a holster on his right hip concealed under his judicial robe. The gun was loaded with a round in the chamber and a full magazine. The Panel found that Judge Woldt was legally carrying the concealed gun pursuant to Wis. Stat. § 175.60(16)(b)(2). The complaint further alleged and the Panel found that, when the transcript indicates that Judge Woldt "[held] up a gun," he (a) removed the handgun from its holster beneath his robe, (b) ejected the loaded magazine, (c) racked the handgun's slide to eject the bullet from the gun's chamber, and then briefly displayed the gun "as a 'prop'" to those present in the court. Although the Commission stipulated that the gun was not loaded when Judge Woldt held it up for those in the courtroom to see, he did not state that fact to those individuals. In addition, the parties stipulated that no one asked Judge Woldt whether he carried a firearm or whether he would display his gun and that Judge Woldt was not in fear for his safety. Based on the Joint Stipulation, the Panel's findings also contained a paragraph

12

that stated that when Judge Woldt displayed his handgun during this hearing, he (a) did not have his finger on the trigger or inside the trigger guard and (b) did not point the gun at any person in the courtroom.

¶21 Given these facts, the Panel concluded that during this sentencing hearing Judge Woldt had willfully violated the following provisions of the Code: SCR 60.02, SCR 60.03(1), and SCR 60.04(1)(d).

**Incident Two (January 25, 2016)**

¶22 This incident did not occur during a hearing in a case. Instead, this incident occurred when a group of high school students visited Judge Woldt's courtroom during a Government Day event. Consequently, there is no transcript for this incident.

¶23 As with Judge Woldt's display of his Glock handgun during the Shaffer sentencing hearing described in Incident Three above, he also displayed his handgun to the students. The Commission's complaint alleged, and the Panel found, the same facts as in Incident Three regarding the holstering of the fully loaded and concealed gun, the removal of the magazine and the round in the chamber, and then the brief display of the gun to those present in the courtroom. According to the Panel's finding, Judge Woldt displayed the gun "as a 'prop'" when responding to a student question about courthouse security generally. The question did not ask him whether he carried a firearm, and no one asked him to display a gun. Further, as was the case with Incident Three, Judge Woldt had no fear for his

13

safety at the time he displayed the gun to the high school students.

¶24 The Commission alleged, and the Panel concluded, that Judge Woldt's conduct at the Government Day event, including the display of the handgun, had willfully violated SCR 60.02 and SCR 60.03(1).

**Incident One (April 18, 2016)**

¶25 This incident arose out of a custody/placement modification hearing in Wadleigh v. Wadleigh, Winnebago County Case No. 2009FA594. During the hearing counsel for the petitioner, Attorney Gordon Stillings, cross-examined the director of the Winnebago County Family Court Services. Judge Woldt did not care for a line of Attorney Stillings' questions. He had not expressed his displeasure previously and no objection had been made, but Judge Woldt interrupted the cross-examination with the following exchange:

> The Court: Counsel, there's a thin line between being an advocate and being a "dick" – thin line – and you're blurring it.
>
> Mr. Stillings: Can you be more specific? I'm not understanding –
>
> The Court: I'm not going to play your games with you, okay? I'm not going to play your games with you. You're being very argumentative with this witness, and you're playing games.

¶26 Shortly thereafter, Judge Woldt again interrupted counsel and stated that counsel's question was not relevant. During the following exchange, when the attorney began to state that he was trying to figure out something, Judge Woldt

14

interrupted again and said that counsel was "trying to go back to the way I said you were a couple minutes ago." Judge Woldt then threatened to find a woman in the courtroom in contempt if she gave him "that look one more time."

¶27 In the discussion section of its report, the Panel found that Judge Woldt had "impliedly labelled" counsel a "dick." It concluded that, even if Judge Woldt had been frustrated with the attorney, as he argued in his sanction memorandum, Judge Woldt's comments at the hearing, including his use of the profanity directed at Attorney Stillings, had willfully violated SCR 60.02 and SCR 60.04(1)(d).

¶28 The Panel's final legal conclusion was that Judge Woldt's conduct in the six incidents, as described in the preceding paragraphs, constituted willful violations of the specified SCRs, which therefore constituted judicial misconduct under Wis. Stat. § 757.81(4)(a).

## II. RECOMMENDATION AS TO DISCIPLINE

¶29 Although the parties had entered into a Joint Stipulation that the facts set forth above were true and that Judge Woldt's conduct in the six incidents had violated the specified provisions of the Code of Judicial Conduct, the sanction memoranda that the parties filed with the Panel showed that they strongly disagreed with the way these six incidents should be characterized. Judge Woldt's sanction memorandum generally alleged that the Commission's descriptions of the incidents were incorrect and failed to acknowledge the context in which the incidents occurred. For example, Judge Woldt

denied the Commission's statement that he had called Attorney Stillings a "dick" in Incident One, saying that he had said only that Attorney Stillings was getting close to crossing that line and that his statement was an attempt to exercise his discretion to control the mode of interrogation and protect the witness from undue harassment or embarrassment.  As another example, Judge Woldt disputed the Commission's statement that in Incident Three his crude language had been directed toward the victims and that his display of his gun had been intended to instill fear in the defendant.  He claimed that he was simply trying to show empathy with the victims and that his display of the gun occurred while he was showing empathy to the victims—not when he was addressing the defendant.  With respect to Incident Five, Judge Woldt argued that his comment about the defendant was an "impulsive reaction" to a meritless argument by defense counsel and that his use of the phrase "so-called victim" was not directed toward the victim, as the Commission alleged, because she was not in the courtroom that day.

¶30 The Panel's discussion regarding the level of discipline to be recommended focused, in large degree, on factors that this court has indicated may be considered in determining the appropriate level of discipline.  See In re Judicial Disciplinary Proceedings Against Ziegler, 2008 WI 47, ¶43, 309 Wis. 2d 253, 750 N.W.2d 710.  Those factors include:

    (1)  Whether the misconduct is an isolated instance or evidenced a pattern of misconduct;

    (2)  The nature, extent and frequency of occurrence of the acts of misconduct;

16

(3) Whether the misconduct occurred inside or outside the courtroom or courthouse;

(4) Whether the misconduct occurred in the judge's official capacity or in his or her private life;

(5) Whether the judge has acknowledged or recognized that the acts occurred;

(6) Whether the judge has demonstrated an effort to change or modify his or her conduct;

(7) The extent to which the judge exploited his or her position to satisfy personal desires;

(8) The length of the judge's service on the bench;

(9) Whether prior complaints were filed against the judge; and

(10) The effect the misconduct has upon the integrity of and respect for the judiciary.

Id. (citing In re Inquiry Concerning Patrick C. McCormick, 639 N.W.2d 12, 16 (Iowa 2002)).

¶31 The Panel found that in this case these factors weighed in both directions. It concluded that some factors were mitigating considerations, including Judge Woldt's admission that he had engaged in judicial misconduct, the lack of any personal benefit from his misconduct, his history of service on the bench, and the lack of prior formal complaints against him. The Panel also noted later in its discussion that three of the incidents had occurred within a one-week period of time, which Judge Woldt had described as a tumultuous time in his family circumstances.

¶32 On the other hand, a number of these factors were aggravating and called for a more severe sanction. These aggravating factors included that Judge Woldt's misconduct was far removed from any judicial purpose; that his misconduct

17

occurred in the courtroom and, with one exception, in the middle of court proceedings; that his misconduct occurred in his official capacity as a representative of the judicial system; and that his misconduct had a substantial impact on the integrity of and respect for the judiciary.

¶33 The Panel also discussed separately whether Judge Woldt's six instances of misconduct constituted an aggravating pattern. Ultimately, the Panel believed that the 2009 incident was not part of a pattern because of the period of time between that incident and the other five incidents, but it determined that the five incidents that occurred in just under a year (May 2015-April 2016) did constitute an aggravating pattern of misconduct, rather than a number of isolated incidents. In addition to the closeness in time, the Panel emphasized that all of the incidents of misconduct involved inappropriate demeanor in the courtroom.

¶34 The Panel considered two other judicial disciplinary proceedings where the misconduct had similarly stemmed from improper judicial demeanor: In re Judicial Disciplinary Proceedings Against Gorenstein, 147 Wis. 2d 861, 434 N.W.2d 603 (1989), and In re Judicial Disciplinary Proceedings Against Breitenbach, 167 Wis. 2d 102, 482 N.W.2d 52 (1992). In both of those proceedings, the respondent judge no longer held office at the time of the court's disciplinary proceeding. In each proceeding, the judge was found to have demonstrated over a period of five years a pattern of insensitivity and disrespect to litigants, witnesses, attorneys, and others. This court

18

determined that each judge's pattern of sarcastic, demeaning, and intemperate behavior was serious enough to warrant imposing a two-year suspension during which the judge was prohibited from serving as a judge of any court, including serving as a reserve judge.

¶35 The Panel stated that the decisions in Gorenstein and Breitenbach confirmed that incidents of improper judicial demeanor can warrant serious discipline. It concluded that Judge Woldt's violation of four different sections of the Code and the multiple occasions on which the violations occurred required the imposition of a suspension in order to foster "public confidence in the sanctity of a fair and impartial judiciary." Noting that Judge Woldt's incidents of misconduct were less numerous than those committed by Judges Gorenstein and Breitenbach and weighing the aggravating and mitigating factors, the Panel recommended that Judge Woldt be suspended without pay for a period of not less than seven days nor more than 21 days.

## III. REVIEW OF PANEL REPORT AND ANALYSIS

¶36 Neither party has sought to appeal from any portion of the Panel's findings of fact, conclusions of law, or recommendation for discipline. Nonetheless, we must review the Panel's findings of fact to determine if they are clearly erroneous, and we must review de novo the Panel's conclusions of law regarding whether those facts demonstrate judicial misconduct. Wis. Stat. § 757.91; see also In re Judicial Disciplinary Proceedings Against Crawford, 2001 WI 96, ¶10 n.5, 245 Wis. 2d 373, 629 N.W.2d 1; In re Judicial Disciplinary

19

Proceedings Against Aulik, 146 Wis. 2d 57, 69, 429 N.W.2d 759 (1988). As this court holds the constitutional responsibility for maintaining the proper administration of justice in the courts of this state, we independently determine the appropriate level of discipline to be imposed in light of the particular misconduct and the other facts of each case, benefitting from the Panel's analysis and recommendation.[8]

¶37 Given the parties' stipulation regarding the facts of the six incidents, we do not find clear error regarding any of the specific factual findings set forth by the Panel. We also do not find any of the inferences drawn from those facts in the discussion section of the Panel's report to be unreasonable.

¶38 We agree with the Panel that the stipulated facts and the reasonable inferences from those facts show that Judge Woldt willfully violated the Code of Judicial Conduct as alleged in the complaint, and therefore committed judicial misconduct under Wis. Stat. § 757.81(4)(a).

¶39 Although they concur in the other conclusions of misconduct and in the imposition of a seven-day suspension, two

---

[8] That the decision regarding whether and at what level to impose discipline is committed solely to this court is also supported by the fact that the statute acknowledges that a judicial conduct panel makes only "recommendations regarding appropriate discipline for misconduct." Wis. Stat. § 757.91 (emphasis added). A recommendation is not a judicial act that carries any legal effect. It is this court in which judicial disciplinary proceedings are filed, and it is this court that enters an order specifying the discipline to be imposed on a judge who has committed judicial misconduct.

justices of this court, Justice Roggensack and Justice Rebecca Grassl Bradley, conclude that Judge Woldt's display of his handgun in his courtroom does not constitute a violation of the Code. It is true that there is an exemption to the statutory ban on carrying concealed weapons in a courthouse for judges who are licensed to carry concealed weapons. Wis. Stat. § 175.60(16)(a)6 and (b)2. Judge Woldt held a concealed weapon permit during the incidents at issue in this proceeding. The authorization for a judge to carry a concealed weapon in a courthouse, however, does not resolve the question of whether Judge Woldt's conduct in the two relevant incidents ran afoul of the Code. The law also does not forbid individuals from engaging in impatient, undignified, and disrespectful conduct. Indeed, in most circumstances, the First Amendment to the United States Constitution protects from governmental sanction speech that is impatient, undignified, and disrespectful. That fact, however, does not mean that a judge cannot be disciplined for impatient, undignified, and disrespectful speech when the judge directs that speech to participants in a court proceeding over which the judge is presiding. Indeed, all participating justices in this proceeding agree that Judge Woldt can be and should be disciplined for his impatient, undignified, and disrespectful speech in the incidents at issue here.

¶40 It is important to remember what the Commission's complaint alleged, which is what the Panel found based on the Joint Stipulation. In Incident Three, the Shaffer sentencing hearing, the Panel's conclusions of law state that it was "Judge

21

Woldt's display of his gun <u>and comments</u>" (emphasis added) that
constituted the violations of SCRs 60.02, 60.03(1) and
60.04(1)(d). It was not the simple display of a gun; it was the
display of the gun "as a 'prop'" in connection with the
comments. First, Judge Woldt used undignified, discourteous,
and disrespectful language that demeaned the solemnity of the
court proceeding and his role as the person imposing a just
sentence on behalf of society.[9] In addition, although that case
did not involve any firearm charges or even the use or threat of
any firearm, Judge Woldt essentially used his sentencing
comments to encourage the victims to take matters into their own
hands and use a gun, as he would do. It was at that point that
he brought out the handgun from under his robe to display it for
dramatic emphasis. As the Panel noted, it was not necessary for
any valid judicial purpose to display the gun and introduce an
element of force into the sentencing hearing. Most importantly,
it was immediately after displaying the gun that Judge Woldt
turned to addressing the defendant, who was a young man with
substantial cognitive limitations. Just two sentences after
holding up the gun, Judge Woldt told this young man that he was

---

[9] Judge Woldt's comments included the following:

Damn it, it's my house. It's my first house, and I
don't want to move. Why should I have to move if I
haven't done anything wrong? I understand that, but I
also understand that I don't give a shit about my
idealistic beliefs, if it comes down to my family's
safety, I'm moving my ass out of there.

22

lucky that he had not entered Judge Woldt's house because Judge Woldt would have shot him dead on the spot with the gun that he always keeps with him (and had just displayed). That comment in connection with the display of the gun served no purpose other than to menace and frighten the young man. Finally, as the Panel also noted, "Judge Woldt's comments about his own personal fear and the display of the handgun served only to personalize the proceeding and detract from his role as an impartial and fair decision maker."

¶41 We have no hesitation in concluding that Judge Woldt's comments, when combined with the unnecessary display of his personal handgun during the sentencing proceeding, constituted a failure to observe "high standards of conduct" "so that the integrity and independence of the judiciary will be preserved." SCR 60.02. A judge who displays a personal gun as a "prop" during a court proceeding and then immediately threatens to use it to kill the defendant if he ever broke into the judge's residence is not demonstrating the integrity of the judiciary, SCR 60.02, and is not "promot[ing] public confidence in the integrity and impartiality of the judiciary." SCR 60.03(1). Such conduct does not show that the judge is conducting himself or herself as a respected judicial officer applying the law in a dispassionate and reasoned manner, as the public expects judges to do. Judge Woldt's conduct during the Shaffer sentencing hearing also cannot be described as "patient, dignified and courteous to litigants, jurors, witnesses, lawyers and others with whom the judge deals in an official capacity."

23

SCR 60.04(1)(d). The facts of the Shaffer sentencing hearing adequately prove the three Judicial Code violations alleged in the Commission's complaint.

¶42 Similarly, Judge Woldt's conduct during the Government Day event must be considered in context. He was meeting with a group of high school students. When asked a general question about courthouse security, he responded by displaying his gun again as a "prop," apparently to make dramatic his ongoing courthouse security complaints.[10] No one asked him whether he carried a gun, and no one asked to see the gun. There was no reason to pull out a gun in response to a question from a high school student. Although the Joint Stipulation indicates that the gun was not loaded at the time it was displayed, Judge Woldt did not disclose that fact to the students. All they knew was that an adult judge in a black robe sitting on a judicial bench in a courtroom suddenly pulled out a gun, which for all they knew could have been loaded. As was the case with the Shaffer sentencing, Judge Woldt's dramatic introduction of the use of force in the form of his personal handgun unnecessarily personalized what should have been an educational discussion about a topic of civic interest. Drawing a gun in front of a

---

[10] The Panel explicitly found that Judge Woldt had used his gun "as a 'prop'" when stating his views on courthouse security in response to the student's question and that he did so to give dramatic effect to his response. Judicial Conduct Panel's Findings of Fact, Conclusions of Law and Recommendation ¶11 and p. 19.

group of teenage high school students when on the bench in one's capacity as a representative of the judicial branch and when there is no judicial purpose for doing so does not promote confidence in the judge as a dispassionate and impartial arbiter of the law or in the judiciary as a whole. Moreover, Judge Woldt expressly "accept[ed] that displaying the gun was unnecessary and ill-advised, and stipulate[d] that it violated SCR 60.03(1) and 60.02." Respondent's Brief Regarding Sanctions at 9. We therefore conclude that the Panel was correct to conclude that Judge Woldt's conduct in the context of the Government Day event violated both SCR 60.02 and SCR 60.03(1).

¶43 Having concluded that Judge Woldt committed misconduct in all six incidents, we now turn to the appropriate level of discipline.

¶44 The purpose of judicial discipline is not to punish the judge, In re Judicial Disciplinary Proceedings Against Aulik, 146 Wis. 2d 57, 77, 429 N.W.2d 579 (1988), but "to protect the court system and the public it serves from unacceptable judicial behavior." In re Judicial Disciplinary Proceedings Against Gorenstein, 147 Wis. 2d 861, 873, 434 N.W.2d 603 (1989); see also Aulik, 146 Wis. 2d at 77. The level of discipline, therefore, should be determined by the amount of protection that is needed, given the seriousness of the judge's misconduct and the likelihood that it would recur. Gorenstein, 147 Wis. 2d at 873. Discipline "commensurate with the conduct" also is necessary to maintain the integrity of the judicial process and to demonstrate that integrity to the public so that

the public retains confidence in the courts of this state. Crawford, 2001 WI 96, ¶39;[11] see also Aulik, 146 Wis. 2d at 77.

¶45 In his sanction brief to the Panel, Judge Woldt contended that this court imposes a suspension rather than a reprimand only when the respondent judge's conduct has involved some degree of "moral culpability." We acknowledge that we have previously stated that we consider suspension and removal from office to be "drastic measures" that are generally reserved for serious, repeated or persistent violations of the Code. In re Judicial Disciplinary Proceedings Against Seraphim, 97 Wis. 2d 485, 513, 294 N.W.2d 485 (1980). We have not, however, made "moral culpability" a bright-line test for the imposition of a suspension. To the contrary, we have expressly stated that we do not use bright-line standards when determining the appropriate level of discipline:

---

[11] The court in Crawford explained this purpose of discipline as follows:

> The sanction that we impose must convey to the public the gravity with which this court views judicial misconduct. Those who sit in judgment in both civil and criminal matters, in which the lives and livelihoods of the citizens of this state are involved, must be above reproach. When a judge fails to live up to the demanding, but necessary, standards that are imposed upon the elected judiciary, the integrity of the entire judicial process can be only reaffirmed by a sanction commensurate with the conduct.

In re Judicial Disciplinary Proceedings Against Crawford, 2001 WI 96, ¶39, 245 Wis. 2d 373, 629 N.W.2d 1.

26

> We have not established, nor will we here, a "bright-line" standard when, for example, reprimand or suspension is warranted as opposed to suspension. Each case is different, and is considered on the basis of its own facts.

Crawford, 245 Wis. 2d 373, ¶40. We will, therefore, determine the appropriate level of discipline for Judge Woldt's judicial misconduct based on the particular facts of this case.

¶46 In general, we agree with the Panel's view of the aggravating and mitigating factors present in this case, although we depart from the Panel on a couple of points.

¶47 We begin with the nature of Judge Woldt's misconduct, which we view to be serious and to have a significant detrimental impact on the public's view of the judiciary. We have already discussed how Judge Woldt used undignified, discourteous, and disrespectful language unbecoming a judge and essentially threatened a young defendant with cognitive impairments in the Shaffer sentencing. In the Krebs sentencing, he again used profane language and imagery to demean what he believed defense counsel's argument to be. He displayed irritation with counsel's attempt simply to make arguments on behalf of his client and made clear that he wanted Krebs' counsel, as well as all other attorneys who appear in his court, to "get to the point" or "jump to the chase" because he does not wish to hear extended arguments. Indeed, he said that when proceedings are taking longer than he would like, attorneys should know that the best thing they can do is to "shut their pie holes." A highly distressing part of Judge Woldt's conduct during the Krebs hearing was his fairly blatant attempt to

27

intimidate the defendant into waiving his right to speak in allocution.  Equally distressing, he referred to the 13-year-old victim in the case as a "so-called victim," thereby questioning in open court whether the young girl had really suffered a second-degree sexual assault despite the fact that he had accepted the defendant's plea to that crime.[12]  Finally, in the first incident at issue here, the 2009 sentencing in the Williams case, Judge Woldt mischaracterized the in-court statement of the victim in a domestic violence case[13] and then castigated her for having the temerity to express her opinion of her current relationship with the defendant, essentially

---

[12] Judge Woldt's sanction memorandum to the Panel noted that the victim was not in the courtroom for the sentencing hearing. The fact that the victim was not in the courtroom to hear Judge Woldt's demeaning comment in person matters little.  The important thing for purposes of the Code and this proceeding is the fact that Judge Woldt made the comment.  In addition, Judge Woldt made the comment on the record in open court.  Even though the victim did not hear the comment as it was uttered, there is a strong possibility that she learned of the comment at some later time.

[13] Judge Woldt said to the victim that he was "sick and tired of victims coming in here and they call the cops when they need 'em but then later on they come and say:  Oh, no, this person's an angel."  His statement clearly implied that this victim had also stated in court that the defendant was an "angel."  That was not what the victim had said.  What she said was that she hoped the court would impose a fine and community service rather than an extended period of probation "because we are trying to work things out and things have been a lot better."  Judge Woldt was free not to credit her statement, if he had a basis for doing so, and he was also free to impose probation and counseling despite her statement.  What he was not free to do was to mischaracterize her statement and treat her without dignity, respect, and sensitivity.

discouraging her from calling the police in any future domestic violence situations. These are all serious violations of a judge's ethical duties and show an open and callous disregard of Judge Woldt's obligation to serve the public in a fair, reasoned, impartial, and courteous way.

¶48 We part ways to a limited extent with the Panel's conclusion about whether there was a pattern to Judge Woldt's misconduct. The Panel thought that there was a pattern with respect to the five incidents that occurred between May 2015 and April 2016, but it believed that the February 2009 incident was not part of a pattern of misconduct because of the length of time that passed between that incident and the next one. We acknowledge that there was a substantial period of intervening time between the first two incidents at issue, but that passage of time, by itself, does not eliminate the pattern that has existed from 2009 to 2016. The 2009 incident in the Williams sentencing, in which Judge Woldt mistreated the domestic violence victim using undignified, discourteous, and disrespectful language, was no different in type from the undignified, discourteous, and disrespectful manner in which Judge Woldt treated people in his courtroom in 2015 and 2016. Unfortunately, the fact that Judge Woldt acted the same way in his courtroom back in 2009 indicates that this was not an isolated instance. That makes the misconduct even more serious and the need for a sanction that will deter Judge Woldt from continuing to act in that manner all the more pressing.

29

¶49 In addition, all of the incidents of misconduct occurred in the courthouse where Judge Woldt was acting in his official capacity as a circuit court judge. Five of the six incidents occurred during case proceedings in open court. All of the incidents have certainly had a negative effect on the public's respect for the integrity, fairness, and competency of the judiciary.

¶50 On the mitigating side of the ledger, we acknowledge that Judge Woldt has acknowledged that he committed judicial misconduct by entering into a stipulation to that effect, although his sanction brief to the Panel did attempt to minimize the nature and extent of his wrongdoing. We also acknowledge Judge Woldt's assertion that he has attempted to modify his conduct. In addition, Judge Woldt does have an extended period of service as a circuit court judge, and there have not been any prior formal complaints filed with this court by the Commission regarding his judicial performance. All of these factors lessen the sanction that would otherwise be appropriate for the misconduct in this case.

¶51 Although each case is unique, prior disciplinary proceedings may inform our consideration of the proper level of discipline to impose. In this case we believe that three prior judicial disciplinary proceedings are relevant. We agree with the Panel that Judge Woldt's sarcastic, demeaning, and disrespectful comments to people in his courtroom are similar in nature to the judicial misconduct committed by Judges Gorenstein and Breitenbach. Judge Woldt's misconduct, however, is neither

30

as egregious nor as persistent as their misconduct.  The third disciplinary proceeding that has a similar type of misconduct was In re Judicial Disciplinary Proceedings Against Michelson, 225 Wis. 2d 221, 591 N.W.2d 843 (1999).  In that case, we imposed a public reprimand on Judge Michelson for a single incident in which he called the daughter of a litigant a "slut" for having a child out of wedlock.  Judge Woldt's conduct is more serious than that committed by Judge Michelson, and it occurred on multiple occasions rather than on just one occasion.

¶52  Having considered all of the facts of this proceeding, including all of the appropriate aggravating and mitigating factors, we conclude that a short suspension is necessary in this situation to assure the members of the public that judges will treat them with dignity, fairness, and respect when they enter the courtrooms of this state, and to impress upon Judge Woldt the seriousness of his misconduct and the need for him to change how he treats the jurors, lawyers, litigants, witnesses, victims, and staff with whom he interacts.  Given Judge Woldt's lengthy history of service on the bench, the fact that he has not previously been the subject of a disciplinary complaint, and the fact that five years have passed since the last incident at issue here, we conclude that a seven-day suspension will be sufficient to ensure that there will not be a repetition of this

misconduct by Judge Woldt.[14]  We remind him and the other judges in this state that how justice is dispensed is often just as important as the substance of the legal ruling.

¶53  IT IS ORDERED that Scott C. Woldt is suspended from the office of circuit judge without compensation and prohibited from exercising any of the powers or duties of a circuit judge in Wisconsin for a period of seven days, commencing August 2, 2021.

¶54  ANNETTE KINGSLAND ZIEGLER, C.J. and BRIAN HAGEDORN, J., did not participate.

---

[14] Although there are differences among the participating justices regarding the presence of violations of the Code of Judicial Conduct due to Judge Woldt's displays of his handgun in his courtroom, the participating justices are unanimous that a seven-day suspension is the proper level of discipline to impose in this proceeding.

¶55 REBECCA GRASSL BRADLEY, J. *(concurring in part, dissenting in part).* The Judicial Code of Conduct's (the "Code") Preamble states: "Care must be taken that the Code's necessarily general rules do not constitute a trap for the unwary judge or a weapon to be wielded unscrupulously against a judge." SCR 60 pmbl. Three members of this court disregard this prefatory admonition and weaponize the Code, brandishing it as a "blunderbuss" that may be used by "any lawyer or any pundit" with a political agenda.[1] See Ronald D. Rotunda, Judicial Ethics, the Appearance of Impropriety, and the Proposed New ABA Judicial Code, 34 Hofstra L. Rev. 1337, 1341 (2006). The majority conjures Code violations from provisions that do not encompass the charged conduct, even under the most generous construction of the language. Overly broad constructions of the Code risk "demean[ing] the seriousness of the charge of an ethics violation[.]" Id. at 1377. Even worse, such manipulations of the Code unjustly "besmirch and tarnish" the reputation of individual judges and the judiciary as a whole. See id. at 1341. They also undermine the public's confidence in the justice system, which is contrary to the Code's purpose. SCR 60.02 cmt.; cf. State v. Hermann, 2015 WI 84, ¶141, 364 Wis. 2d 336, 867 N.W.2d 772 (Ziegler, J., concurring) (discussing Caperton v. A.T. Massey Coal Co., 556 U.S. 868

---

[1] Political attacks on the judiciary have been a significant problem in Wisconsin. See generally Patience Drake Roggensack, Tough Talk and the Institutional Legitimacy of Our Courts, Hallows Lecture (Mar. 7, 2017), in Marq. Law., Fall 2017, at 47.

(2009)) ("If a judge were required to recuse whenever a person could conjure a reason to question a judge's impartiality, a judge could be attacked without a standard on which to evaluate the attack. We have rejected a loose and standardless test, as the Supreme Court in Caperton did, in no small part because it would invite mischief and judge shopping.").

¶56 In this matter, a three-justice majority[2] ignores the Code's Preamble and distorts the text of the Code provisions it invokes to justify a legally unsupportable finding of misconduct premised on a judge's display of a handgun he lawfully carried. In doing so, three justices establish a precedent that may be wielded unscrupulously against other judges in the future. The majority unearths three dormant traps buried within the Code's general rules for one unwary judge, the Honorable Scott C. Woldt of Winnebago County. After misstating the facts——and with almost no textual analysis of the Code——the majority concludes that Judge Woldt violated three separate rules by briefly

---

[2] Two Justices did not participate, leaving only five Justices to decide this matter. See State v. Hermann, 2015 WI 84, ¶154, 364 Wis. 2d 336, 867 N.W.2d 772 (Ziegler, J., concurring) ("Citizens of the state deserve to have the entire supreme court decide all cases unless extreme circumstances require otherwise. Unlike the circuit court or the court of appeals, the supreme court serves a law development purpose; therefore, cases before the supreme court impact more than parties before the court."); William H. Rehnquist, Sense and Nonsense About Judicial Ethics, 28 Rec. Ass'n B. City N.Y. 694, 707 (1973) ("Where we deal with appellate courts which customarily sit en banc, it seems to me scarcely debatable that decisions of important questions of statutory or constitutional law by less than a full court are, other things being equal, undesirable.").

displaying a firearm while making innocuous statements in his courtroom on two occasions.

¶57 The majority's analysis suggests that it is disciplining Judge Woldt at least in part because it considers the display of a firearm offensive. This court should be wary of suspending a judge elected by the people, thereby temporarily subverting the will of the people, particularly when part of the basis for such discipline rests on three Justices regarding his conduct as politically incorrect. See In re Seraphim, 97 Wis. 2d 485, 513, 294 N.W.2d 485 (1980) (per curiam) ("Suspension and removal, to be sure, are drastic measures."); cf. In re Amendment of the Code of Judicial Conduct's Rules on Recusal, 2010 WI 73, ¶11 (Roggensack, J., statement in support), https://www.wicourts.gov/sc/rulhear/DisplayDocument.pdf?content=pdf&seqNo=51874 ("We elect judges in Wisconsin; therefore, judicial recusal rules have the potential to impact the effectiveness of citizens' votes cast for judges."). While I concur with the court's decision that a one week suspension without pay is appropriate discipline for other conduct, I dissent from the majority's decision that Judge Woldt's displays of a firearm constitute misconduct.

## I. BACKGROUND

¶58 Judge Woldt was appointed to the bench in 2004 and the voters of Winnebago County elected and re-elected him to three terms of service since his appointment. He has presided over 27,096 cases through disposition.[3] Based on statistics provided

---

[3] Judicial Conduct Panel, ¶34.

by the District Court Administrator, he had a below average judicial substitution rate from 2014 to 2018.[4] Other than the present matter, he has not been the subject of any public or private judicial discipline.[5] While he was an attorney in private practice from 1987 to 2004, Judge Woldt was not subject to any public or private attorney discipline.[6] The Judicial Conduct Panel found that he cooperated with the Judicial Commission's investigation.[7]

¶59 The Judicial Commission filed a complaint against Judge Woldt for six "incidents." Only the second and third incidents involved Judge Woldt's display of a firearm. During the third incident, Judge Woldt used profanity, and in so doing, violated the Code. I agree with the majority on this point. I part ways with the majority because it characterizes the brief display of the firearm as misconduct. No provision of the Code supports that conclusion. I also part ways with the majority because it misconstrues several innocuous statements made during the second and third incidents.

¶60 Importantly, the Judicial Commission's complaint acknowledges that Judge Woldt had a license to carry a handgun. It also acknowledges that properly licensed judges, including Judge Woldt, are expressly permitted by statute to carry a

---

[4] Id., ¶35.

[5] Id., ¶31.

[6] Id.

[7] Id., ¶32.

4

firearm in a courthouse——either openly or concealed.[8] Judge Woldt has not been accused of violating any statutory laws regulating the possession or use of firearms. Accordingly, the court's review on this issue is limited to whether Judge Woldt's display of the firearm, on one or both occasions, violated the Code.

### A. The Second Incident – "Government Day"

¶61 In early 2016, Judge Woldt participated in an event known as "Government Day," which was sponsored by the local chamber of commerce. Judge Woldt met with high school students in the courtroom, and the students were scheduled to later participate in a debate before the County Board on "courthouse security."[9] When the students met with Judge Woldt, one student

---

[8] Wisconsin Stat. § 175.60(16)(a)6 (2019-20) provides, in relevant part:

> (a) Except as provided in par. (b), neither a licensee nor an out-of-state licensee may knowingly carry a concealed weapon, a weapon that is not concealed, or a firearm that is not a weapon in any of the following places: . . .
>
> > 6. Any portion of a building that is a county, state, or federal courthouse.

Paragraph (b) provides:

> The prohibitions of para. (a) do not apply to any of the following: . . .
>
> > 2. A weapon in a courthouse or courtroom if a judge who is a licensee is carrying the weapon or if another licensee or out-of-state licensee, whom a judge has permitted in writing to carry a weapon, is carrying the weapon.

[9] The Judicial Conduct Panel did not mention this debate in

(continued)

5

asked him for his thoughts on the debate topic. Judge Woldt proceeded to un-holster a handgun from beneath his robe.[10] He then removed the handgun's magazine and ejected the round in the chamber.[11] Next, he briefly raised the handgun, without pointing it at anyone and without his finger near the trigger guard,[12] and explained that he had the handgun for his protection.

B. The Third Incident – Sentencing in State v. Shaffer

¶62 A similar incident occurred in the summer of 2015. Judge Woldt was presiding over a sentencing hearing in State v. Shaffer.[13] The defendant was charged with stalking and residential burglary.[14] He pled no contest to the stalking charge, and the burglary charge was dismissed and read in. Two victims were present at the sentencing hearing, and one victim explained that the defendant's conduct made him feel that he could not assure his wife of her safety in their home.[15] The

---

its findings of fact, but the Judicial Commission acknowledged the debate in its reply brief. Judicial Commission's Reply Br., at 5 ("Even though Judge Woldt knew that the high school students were debating the issue of courthouse security, it is entirely reasonable to infer that Judge Woldt intentionally involved these students in his dispute with the County Board (albeit in a minor way). After all, Judge Woldt knew when he displayed his firearm to them, that they would be debating courthouse security in front of the County Board[.]").

[10] Complaint, ¶¶14-15.

[11] Id., ¶15.

[12] Id.

[13] Winnebago County Case No. 2014CF509.

[14] Judicial Conduct Panel, ¶13.

[15] Id., ¶15.

transcript reflects that Judge Woldt responded to the victim's concerns as follows:

> I understand the fear of the victims in this case. . . . I've been trying to get security into this courthouse. There is none. Any one of you could have walked in today with a gun. . . . So I have that fear too. So what can I tell you to do with that fear? I have tried the County Board, I have tried everything to get people to do something to keep guns out of this courthouse, and nothing happens, so you know, you got to take it -- you gotta do what you need to do to protect yourself. I can tell you what I do now. This is what I do -- (the court holds up a gun). That I keep up here on the bench just because I want to protect myself. Now, I'm not saying you should do that but if I was in your -- if I was in your situation, I'd have it on my side all the time.[16]

The Judicial Conduct Panel found the transcript's notation that "(the court holds up a gun)," means that Judge Woldt proceeded in much the same way that he did on Government Day. Judge Woldt un-holstered a handgun from beneath his robe. He then removed the handgun's magazine and ejected the round in the chamber. He did not point the handgun at anyone and his finger was not near the trigger guard.[17] According to Judge Woldt, his intent was to "express[] his understandings of the victims' fear" and "show the victims 'what he does' for personal safety."[18]

¶63 The parties seem to dispute whether Judge Woldt then lowered the handgun before telling the defendant, "[w]ith today's laws with the Castle Doctrine, you're lucky you're not

---

[16] Id., ¶16.

[17] Id., ¶¶17–18.

[18] Judge Woldt's Br., at 10–11.

dead because, if you would have came into my house, I keep my gun with me and you'd be dead, plain and simple but that's what makes this so scary."[19]  Notably, the complaint says that Judge Woldt "raised and briefly displayed the handgun to those present in the court," but it does not indicate when he lowered the handgun.[20]  Judge Woldt has explained his intent in making this statement was to "caution the defendant of the dangers of invading private homes."[21]

¶64 Shortly after Judge Woldt made this statement, he spoke directly to the victims present at the sentencing hearing. He told them:

> [W]hat can I do to protect the public from [the defendant] because he's not going to change, and that's incarceration.  That's the only thing I can do is take him out of society by doing it, but I can also do some things also to hopefully make the victims more at ease 'cuz I agree with you with respect -- I agree -- I agree with you, partly because I am an idealist also.  Damn it, it's my house.  It's my first house, I don't want to move.  Why should I have to move if I haven't done anything wrong?  I understand that, but I also understand that I don't give a shit about my idealistic beliefs, if it comes down to my family's safety I'm moving my ass out of there.[22]

---

[19] Compare id., at 11, with Judicial Commission's Reply Br., at 6.

[20] Complaint, ¶22 (emphasis added).

[21] Judge Woldt's Br., at 11.

[22] Judicial Conduct Panel, ¶20.

Notwithstanding his profane language, the Judicial Conduct Panel noted, "[t]here is no indication that any of the cases at issue were improperly influenced by Judge Woldt's misconduct."[23]

### C. Procedural History

¶65 For the second incident, the Judicial Commission charged Judge Woldt with violating SCR 60.02 and 60.03(1). For the third incident, it charged him with violating the same two rules, along with a third, SCR 60.04(1)(d). Judge Woldt answered the Judicial Commission's complaint by admitting the complaint's factual allegations and conceding the conclusions of law; however, he noted that "the Commission's argument for suspension omits facts, ignores context, and, at times, unfairly portrays the selected facts on which it does rely."[24] So, while the parties agree on the facts, they strongly disagree on their characterization and the inferences that can be reasonably drawn from them. A Judicial Conduct Panel convened to recommend appropriate discipline. The Panel accepted the stipulated facts and conclusions of law and recommended Judge Woldt be suspended for one to three weeks without pay.

### II. ANALYSIS

### A. Standard of Review

¶66 We accept the findings of fact of a Judicial Conduct Panel unless they are clearly erroneous. In re Crawford, 2001 WI 96, ¶10 n.5, 245 Wis. 2d 373, 629 N.W.2d 1 (per curiam). We

---

[23] Id., ¶37.

[24] Judge Woldt's Br., at 1-2.

decide questions of law, including the proper interpretation and application of the Code, independently.[25] See Filppula-McArthur ex rel. Angus v. Halloin, 2001 WI 8, ¶32, 241 Wis. 2d 110, 622 N.W.2d 436 (citing City of West Allis v. Sheedy, 211 Wis. 2d 92, 96, 564 N.W.2d 708 (1997)); see also Gabler v. Crime Victims Rights Bd., 2017 WI 67, ¶47, 376 Wis. 2d 147, 897 N.W.2d 384. We are not bound by a party's concession of law. State v. Anderson, 2014 WI 93, ¶19, 357 Wis. 2d 337, 851 N.W.2d 760 (citing Bergmann v. McCaughtry, 211 Wis. 2d 1, 7, 564 N.W.2d 712 (1997)); St. Augustine Sch. v. Taylor, 2021 WI 70, ¶102, __ Wis. 2d __, __ N.W.2d __ (Rebecca Grassl Bradley, J., dissenting) (quoting Ross v. Bd. of Outagamie Cnty. Supervisors, 12 Wis. 26, 44 (1860) (Dixon, C.J., dissenting)) ("We sit here to decide the law as we find it, and not as the parties or others may have supposed it to be."). Therefore, we are not obligated to accept Judge Woldt's concession that he violated the Code by displaying a firearm.

¶67 The Judicial Commission, as the prosecutor, bears the burdens of proof and persuasion. See Wis. Stat. § 757.85(6) (2019-20).[26] It can prosecute only "misconduct" or "permanent

---

[25] A Judicial Conduct Panel has the statutory authority to make "recommendations regarding appropriate discipline for misconduct." Wis. Stat. § 757.91. As the majority explains, "[a] recommendation is not a judicial act that carries any legal effect. It is this court in which judicial disciplinary proceedings are filed, and it is this court that enters an order specifying the discipline to be imposed on a judge who has committed judicial misconduct." Majority op., ¶36 n.8.

[26] All subsequent references to the Wisconsin Statutes are to the 2019-20 version.

disability," which are both statutorily-defined terms. Id.; § 757.81(4), (6). This matter involves allegations of misconduct, not permanent disability. Notably, not every violation of the Code constitutes misconduct. Something more is required. § 757.81(4); In re Tesmer, 219 Wis. 2d 708, 728, 580 N.W.2d 307 (1998). In the context of this matter, the alleged violations must be willful to constitute misconduct. § 757.81(4)(a). A violation of the Code is willful if, according to our controlling precedent, "the judge's conduct was not the result of duress or coercion and . . . the judge knew or should have known that the conduct was prohibited by the Code[.]" Tesmer, 219 Wis. 2d at 729.

### B. Establishing the Facts

¶68 In the Judicial Commission's brief, it asserted that Judge Woldt was involved in an ongoing political dispute with the County Board regarding courthouse security.[27] The Commission inferred from the alleged existence of this dispute that when Judge Woldt displayed his handgun, his intent was to hijack Government Day to make a political statement that served no

---

[27] Judicial Commission's Br., at 24-25 ("Judge Woldt seemingly had one motive for using his handgun as a 'prop' in both circumstances: expressing his dissatisfaction with the manner in which courthouse security was being addressed by the board. . . . Judge Woldt knew that the students who were in his courtroom for Government Day were also going to be meeting with the County Board that same day and, by his actions, unnecessarily involved the students in their ongoing dispute.").

11

legitimate judicial purpose.[28] Importantly, the Commission's complaint does not mention this alleged political dispute. Neither does the Judicial Conduct Panel's finding of facts.

¶69 Nevertheless, the majority blithely adopts the Judicial Commission's portrayal of Judge Woldt as a gun-toting cowboy who misused his office to advance his stance in an ongoing political battle. The majority writes, for example, "[w]hen asked a general question about courthouse security, [Judge Woldt] responded by displaying his gun . . . as a 'prop,' apparently to make dramatic his ongoing courthouse security complaints."[29]

¶70 The majority errs by failing to apply the proper standard of review and by essentially shifting the burdens of proof and persuasion to Judge Woldt. We review the Judicial Conduct Panel's finding of facts; we do not consider unsubstantiated assertions of the Judicial Commission. Crawford, 245 Wis. 2d 373, ¶10 n.5. The Panel's findings do not mention an ongoing political dispute, likely because the Judicial Commission's complaint does not allege one. Admittedly, Judge Woldt said at the sentencing hearing in Shaffer, "I've tried the County Board, I have tried everything to get people to do something to keep guns out of this

---

[28] Id. at 26 ("It appears that Judge Woldt had an alternative plan for the students when he used the event as his opportunity to complain about his dispute with the County Board[.]").

[29] Majority op., ¶42.

12

courthouse, and nothing happens, so you know, you got to take it -- you gotta do what you need to do to protect yourself."[30] The majority mischaracterizes this judge's concerns about courthouse security as a political battle with the County Board. The stipulated facts do not support the majority's narrative. On Government Day, Judge Woldt was responding to a high school student's question, not advancing a political agenda. If the debate topic was politically sensitive, that is not Judge Woldt's fault; there is no evidence that he picked the debate topic or was involved with organizing or planning Government Day.

¶71 The majority seemingly attributes its own firearm phobias to the high school students, suggesting they were frightened, scared, or otherwise discomforted by Judge Woldt's conduct. There is no evidence of this either. The majority states, "[a]lthough the Joint Stipulation indicates that the gun was not loaded at the time it was displayed, Judge Woldt did not disclose that fact to the students."[31] Continuing its speculation regarding the mindset of the students, the majority proclaims, "[a]ll [the students] knew was that an adult judge sitting in a black robe on a judicial bench in a courtroom suddenly pulled out a gun, which for all they knew could have been loaded."[32] The majority's apprehensions are belied by its

---

[30] Complaint, ¶21.

[31] Majority op., ¶42.

[32] Id.

13

own emphasis of Judge Woldt's safe handling of the handgun. The majority explains that he: "(a) removed the handgun from its holster beneath his robe, (b) ejected the loaded magazine, [and] (c) racked the handgun's slide to eject the bullet from the gun's chamber . . . ."[33] Any reasonable observer would understand that Judge Woldt unloaded the handgun. Why the majority suggests he should have verbally stated that the handgun was unloaded is unclear.

¶72 While condemning Judge Woldt for using the handgun as a "dramatic" rhetorical device, the majority engages in a dramatic display of its own in its discussion of the <u>Shaffer</u> sentencing hearing. According to the majority, "Judge Woldt essentially used his sentencing comments to encourage the victims to take matters into their own hands and use a gun, as he would do."[34] This statement implies that Judge Woldt encouraged a sort of vigilantism. He did no such thing. He said:

> I can tell you what I do now. This is what I do -- (the court holds up a gun). That I keep up here on the bench just because I want to protect myself. Now, <u>I'm not saying you should do that</u> but if I was in your -- if I was in your situation, I'd have it on my side all the time.

(emphasis added). Judge Woldt told the victims what he would do "if [he] was in [their] situation." He explained that he would exercise his natural right to self-defense by carrying a

---

[33] <u>Id.</u>, ¶¶20, 23.

[34] <u>Id.</u>, ¶40.

14

firearm——a right that is protected by the United States Constitution as well as the Wisconsin Constitution. U.S. Const. amend. II; Wis. Const. art. I, §§ 1, 25. Telling victims that others in their situation may consider exercising a fundamental right for defense of hearth and home is qualitatively different from telling them to "take matters into their own hands."

¶73 The majority expands its hyperbole when it moralizes, "it was not necessary for any valid judicial purpose to display the gun and introduce an element of force into the sentencing hearing."[35] The majority then misstates that Judge Woldt "threaten[ed]" to "kill" the defendant if he ever broke into the judge's home.[36] Judge Woldt issued no threat. He said, "[w]ith today's laws with the Castle Doctrine, you're lucky you're not dead because, if you would have came into my house, I keep my gun with me and you'd be dead, plain and simple but that's what makes this so scary." The last part of his statement, "but that's what makes this so scary," is telling. It evidences an intent to convey to the defendant the danger to which he exposes himself through his criminal conduct. Judge Woldt explained to the defendant that he is "lucky" that he did not get shot. In

---

[35] Id.

[36] Id., ¶41.

15

other words, Judge Woldt merely told the defendant that he could have gotten hurt or killed during his criminal activity.[37]

¶74 A summary of a principle in the recent best seller, The Coddling of the American Mind, hits at the very heart of the problem with the majority's hyperbolic statements: "There is a principle in philosophy and rhetoric called the principle of charity, which says that one should interpret other people's statements in their best, most reasonable form, not in the worst or most offensive way possible." Greg Lukianoff & Jonathan Haidt, The Coddling of the American Mind 55 (2018). The majority assumes the worst of Judge Woldt, so it reads into his statements an insidious intent that is not facially or impliedly present. When this court exercises its extraordinary power to discipline elected judges, it should apply the principle of charity, resolving doubts about the intended meaning of a judge's statement in favor of the judge. After all, the Judicial Commission bears the burdens of proof and persuasion. See Wis. Stat. § 757.85(6); see also Republican Party of Minn. v. White, 536 U.S. 765, 796 (2002) (Kennedy, J., concurring) (quoting Bridges v. California, 314 U.S. 252, 273 (1941)) ("We

---

[37] The majority says the defendant had "substantial cognitive deficiencies" and "substantial cognitive limitations." Id., ¶¶17, 40. The Judicial Conduct Panel's finding of facts, however, state the defendant had "cognitive disabilities"——the word "substantial" is noticeably missing. Judicial Conduct Panel, ¶13. The record contains nothing about the nature and extent of the defendant's cognitive impairment, and the majority's suggestion that it is particularly severe is just another example of it playing fast and loose with the facts.

16

should not, even by inadvertence, 'impute to judges a lack of firmness, wisdom, or honor.'").

## C. The Rules

¶75 Compounding its failure to fairly characterize the facts, the majority fails to follow long-established principles of interpretation under which the text of the relevant law controls the analysis of its meaning. The majority does not engage with the text of the Code, instead consigning it to footnotes and declaring violations of the Code nowhere to be found in the text.

¶76 Unlike most statutes, which are enacted by the legislature, this court promulgates the Code, but the Code's rules are functionally equivalent to statutes because they provide notice of established public policy to a regulated entity, i.e., judges. See Calvert v. Mayberry, 440 P.3d 424, 430 (Colo. 2019) (quoting Rocky Mountains Hosp. & Med. Serv. v. Mariani, 916 P.2d 516, 525 (Colo. 1996)) ("Although '[s]tatutes by their nature are the most reasonable and common sources for defining public policy,' professional ethical codes may also be expressions of public policy."); Rich v. Simoni, 772 S.E.2d 327, 328 (W. Va. 2015) (explaining that the Rules of Professional Conduct "are statements of public policy with the equivalent legal force and effect as statutes"). Similar to our approach when interpreting statutes, the Preamble of the Code instructs us to apply its rules "through a reasonable and reasoned application of the text." SCR 60 pmbl.; see Milwaukee Dist. Council 48 v. Milwaukee Cnty., 2019 WI 24, ¶11, 385 Wis. 2d 748,

17

924 N.W.2d 153 (quoting State ex rel. Kalal v. Cir. Ct. for Dane Cnty., 2004 WI 58, ¶45, 271 Wis. 2d 633, 681 N.W.2d 110).

¶77 The majority asserts that each incident constitutes a violation of SCR 60.02, which states:

> **A judge shall uphold the integrity and independence of the judiciary.**
>
> An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining and enforcing high standards of conduct and shall personally observe those standards so that the integrity and independence of the judiciary will be preserved. This chapter applies to every aspect of judicial behavior except purely legal decisions. Legal decisions made in the course of judicial duty on the record are subject solely to judicial review.

The text of SCR 60.02 concerns conduct inconsistent with judicial integrity and judicial independence. Black's Law Dictionary defines "integrity" as "[f]reedom from corruption or impurity; soundness; purity; [m]oral soundness; the quality, state or condition of being honest and upright." Integrity, Black's Law Dictionary (11th ed. 2019). It defines "judicial independence" as "[t]he structural separation of the judiciary from the political branches of government so that judges remain free from improper influences, partisan interests, and the pressures of interest groups." Id. at Judicial independence.

¶78 The comment to SCR 60.02 similarly emphasizes judicial integrity and judicial independence. It states, in relevant part: "Deference to the judgments and rulings of courts depends upon public confidence in the integrity and independence of the judges. The integrity and independence of judges depends in turn upon their acting without fear or favor." SCR 60.02 cmt.;

18

see also <u>Tetra Tech EC, Inc. v. Wis. Dep't of Rev.</u>, 2018 WI 75, ¶64 n.37, 382 Wis. 2d 496, 914 N.W.2d 21 (lead opinion) ("Our Code of Judicial Conduct reflects the foundational importance of keeping core judicial power in the hands of an independent judiciary[.]"); <u>Gabler</u>, 376 Wis. 2d 147, ¶8 ("When structuring the federal judiciary, the Framers knew from experience the perils of adopting a separation of powers in name without paying appropriate attention to the incentives affecting individual judges."); Patience Drake Roggensack, <u>To Begin a Conversation on Judicial Independence</u>, 91 Marq. L. Rev. 535, 535 (2007) ("It has been said that most of the respect the public accords judicial decisions emanates from public perception that a court's decision is an independent determination of what the rule of law requires.").

¶79 The majority also asserts that each incident constitutes a violation of SCR 60.03(1), which states: "A judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." This rule is quite similar to SCR 60.02, but it requires judges to act in accordance with the law and to promote public confidence in judicial impartiality. While judicial independence resists external pressures that threaten a judge's autonomous decision-making, judicial impartiality precludes personal bias in the exercise of judicial judgment. <u>Black's Law Dictionary</u> defines "impartiality" as "[t]he quality, state, or condition of being free from bias and of exercising judgment unswayed by personal interest;

19

disinterestedness." Impartiality, Black's Law Dictionary. As one Australian judge explained: "Impartiality refers to what goes on, and appears to go on, in the mind of the decision maker. Independence concerns the relationship of the decision maker to government, the parties and external influences." Michael Kirby, Judicial Recusal: Differentiating Judicial Impartiality and Judicial Independence, 4 Brit. J. Am. Legal Studs. 1, 1 (2015).

¶80 The Commission adds a third charge for the third incident, citing SCR 60.04(1)(d), which states:

> A judge shall be patient, dignified and courteous to litigants, jurors, witnesses, lawyers and others with whom the judge deals in an official capacity and shall require similar conduct of lawyers, staff, court officials and others subject to the judge's direction and control. During trials and hearings, a judge shall act so that the judge's attitude, manner or tone toward counsel or witnesses does not prevent the proper presentation of the cause or the ascertainment of the truth. A judge may properly intervene if the judge considers it necessary to clarify a point or expedite the proceedings.

¶81 Crucially, the text of SCR 60.04(1)(d) is decidedly different than one of its predecessors, which provided: "[a] judge should not seek to be extreme, peculiar, spectacular or sensational in his or her judgment or in his or her conduct of the court." SCR 60.01(12) (1992). We often consult previous versions of a law to understand the current law's plain meaning. Cnty. of Dane v. LIRC, 2009 WI 9, ¶27, 315 Wis. 2d 293, 759 N.W.2d 571 (quoting Richards v. Badger Mut. Ins. Co., 2008 WI 52, ¶22, 309 Wis. 2d 541, 749 N.W.2d 581); see also Kalal, 271 Wis. 2d 633, ¶52 n.9 (quoting Cass R. Sustein, Interpreting

20

<u>Statutes in the Regulatory State</u>, 103 Harv. L. Rev. 405, 430 (1989)) ("Although it is proper to look at a statute's background in the form of actually enacted and repealed provisions, the legislative history, which was never enacted, should rarely be permitted to supplant the statutory words as they are ordinarily understood."). The history of the Code's language reveals that "extreme, peculiar, spectacular or sensational" behavior means something different than behavior exhibiting a lack of patience, dignity, or courtesy.

## D. Application

¶82 The majority perfunctorily declares that Judge Woldt's displays of a firearm "constituted a failure to observe 'high standards of conduct' 'so that the integrity and independence of the judiciary will be preserved.'"[38] The entirety of the majority's analysis, however, centers on Judge Woldt's comments accompanying the display of the gun. Judge Woldt's conduct on the two occasions in question did not violate any statutory laws, nor does it indicate a lack of honesty or demonstrate the influence of external pressures on his decision-making so as to call into question his judicial independence. In conclusory fashion, the majority next pronounces that displaying a gun "is not 'promot[ing] public confidence in the integrity and impartiality of the judiciary'"[39] and "cannot be described as

---

[38] Majority op., ¶41 (quoting SCR 60.02).

[39] <u>Id.</u> (quoting SCR 60.03(1)).

21

'patient, dignified and courteous[.]'"[40]  Again, the majority neglects to explain how displaying a gun exhibits a lack of integrity, patience, dignity, or courtesy, nor does the majority demonstrate how displaying a gun reveals any internal bias impairing the judge's impartiality.  At best, Judge Woldt's conduct could be characterized as "extreme, peculiar, spectacular or sensational" but that rule is no longer in effect, having been replaced decades ago by one that requires judges to be patient, dignified and courteous.  The majority is bound to apply the rules as they are currently written and not as they may wish them to be.

¶83 Perhaps recognizing the utter absence of any textual basis for its conclusions, the majority insists that "it was 'Judge Woldt's display of his gun and comments' that constituted the violations[.]"[41]  As explained earlier, the comments accompanying Judge Woldt's display of a firearm——whether considered in isolation or in conjunction with the gun——do not give rise to a Code violation (other than the profanity).  Judge Woldt did not threaten anyone or "introduce an element of force" during the Shaffer sentencing hearing.  Black's Law Dictionary defines "force," when used as a noun, as "[p]ower, violence, or pressure directed against a person or thing."  Force, Black's Law Dictionary.  Judge Woldt did not use power or violence against the defendant, nor did he pressure him in any way.  The

---

[40] Id. (quoting SCR 60.04(1)(d)).

[41] Id., ¶40 (quoting Judicial Conduct Panel, ¶¶44-46).

22

majority's characterization of Judge Woldt's display of his firearm during the Government Day event as a "dramatic introduction of the use of force"[42] represents yet another hyperbolic distortion of the facts. No one other than the majority contends that Judge Woldt used any force whatsoever and the record disproves the majority's assertion.

¶84 In one more attempt to bolster its feeble conclusions, the majority contends that Judge Woldt violated the Code by "unnecessarily personaliz[ing]" his statements.[43] The gist of the majority's theory seems to be that this is somehow inconsistent with the judge's role "as a dispassionate and impartial arbiter of the law."[44] With respect to his actions on Government Day, the majority maintains:

> Judge Woldt's dramatic introduction of the use of force in the form of his personal handgun unnecessarily personalized what should have been an educational discussion about a topic of civic interest. Drawing a gun in front of a group of teenage high school students when on the bench in one's capacity as a representative of the judicial branch and when there is no judicial purpose for doing so does not promote confidence in the judge as a dispassionate and impartial arbiter of the law or in the judiciary as a whole.[45]

Regarding the Shaffer sentencing hearing, the majority quotes the Judicial Conduct Panel, which stated, "Judge Woldt's

---

[42] Id., ¶42.

[43] Id., ¶42; see also id., ¶40 (quoting Judicial Conduct Panel, discussion).

[44] Id., ¶42.

[45] Id.

23

comments about his own personal fear and the display of the handgun served only to personalize the proceeding and detract from his role as an impartial and fair decision maker."[46]  The majority does not explain how Judge Woldt's "unnecessary" personalization demonstrated any impartiality during a sentencing hearing, much less during a conversation with high school students detached from any judicial proceeding whatsoever.  While displaying a gun may have been "unnecessary," it did not run afoul of any ethics provision.

¶85  The majority appears to abrogate our decision in State v. Hermann, which expressly held that circuit court judges are entitled to personalize statements made in their judicial capacity, even at sentencing.  364 Wis. 2d 336.  The defendant in that case was convicted of several serious crimes stemming from his decision to drink and drive, including homicide by intoxicated use of a vehicle.  Id., ¶7 (lead opinion).  At sentencing, the judge shared that her sister was killed by a drunk driver.  Id., ¶10.  She even stated, "I probably more than anyone else who would be able to sit on this bench in this county understand the pain that these victims are feeling[.]"  Id., ¶17.  At one point, she said she was "shocked by the seeming blasé faire attitude that this community has about alcohol use[.]"  Id., ¶13.  A three-justice lead opinion, written by Justice Ann Walsh Bradley, concluded that when the

---

[46] Id., ¶40 (quoting Judicial Conduct Panel, discussion).

24

remarks were viewed in context, they did not "appear" to be an "expression of bias."[47] Id., ¶60.

¶86 Hermann expressly permits a judge to personalize a statement at sentencing. Judges are human beings, and they are allowed──perhaps even encouraged──to convey to victims that they sympathize with them. Id., ¶58; Gabler, 376 Wis. 2d 147, ¶58 (quoting Schilling v. State Crime Victims Rights Bd., 2005 WI 17, ¶26, 278 Wis. 2d 216, 692 N.W.2d 623) ("[W]e believe that justice requires that all who are engaged in the prosecution of crimes make every effort to minimize further suffering by crime victims."). Hermann even notes that these kinds of statements are common. Hermann, 364 Wis. 2d 336, ¶22 (citing State v. Hermann, unpublished slip op. No. 2013AP197-CR, ¶9 (Wis. Ct. App. Feb. 13, 2014)). Judges are also permitted to convey to defendants the gravity of their actions and the dangers they pose, as Judge Woldt did when he explained to the defendant at the Shaffer sentencing hearing that many people carry firearms. A criminal never knows who has a gun, and it serves an important judicial purpose to warn defendants of this fact, if nothing else as a deterrent to recidivist behavior.

¶87 When viewed in light of Hermann, neither Judge Woldt's display of the handgun on Government Day nor his display at the Shaffer sentencing hearing establish a rule violation. On

---

[47] The other justices concurred but wrote or joined separate writings to express their concern about an appearance-based recusal standard. Hermann, 364 Wis. 2d 336, ¶71 (Prosser, J., concurring); id., ¶112 (Ziegler, J., concurring).

Government Day, Judge Woldt was not even presiding over a court proceeding. He merely responded to a student's question regarding his thoughts on courthouse security. If he was not permitted to "personalize" his response, he effectively was not permitted to respond at all.

¶88 Another theory of the majority seems to be that on one or both occasions, Judge Woldt's actions may have made people uncomfortable. For example, the majority notes that Judge Woldt did not mention that the handgun was unloaded. Sometimes, judges' personalized statements make people uncomfortable, but that does not render the statements professional misconduct. A judge does not demonstrate a lack of patience, dignity, or courtesy, let alone a lack of integrity, independence, or impartiality, by making people uncomfortable.

¶89 Even if the majority's theories had abstract merit, the majority's inability to explain how Judge Woldt willfully violated the Code by displaying a handgun precludes a misconduct finding. The Judicial Commission bears the burden of proving not only a violation but a willful one. To be willful, Judge Woldt had to have actual or constructive knowledge that his conduct violated the Code. Tesmer, 219 Wis. 2d at 729. The majority announces a novel rule of law, so Judge Woldt cannot be held to have had actual or constructive knowledge of it. Id. at 731–32 ("[W]e conclude that Judge Tesmer's violation of SCR 60.20 was not wilful . . . . [T]he only reported cases in which a judge was disciplined for having engaged in ex parte

communications concerned communications with one of the parties to a pending proceeding.").

¶90 On a final note, the majority raises a red herring by insinuating that my conclusions are grounded in the statutory right to concealed carry and the constitutional right to keep and bear arms.[48] They aren't. It is the text of the Code that governs this matter and nothing in the actual text of the Code prohibits the display of a firearm. While the comment to SCR 60.03 counsels against reading the Code in a manner that permits "onerous" depravations of judges' "fundamental freedoms," the majority errs because it declines to undertake any textual analysis of the Code and utterly fails to connect a judge's display of a handgun to the text of any of its provisions. Judge Woldt's display of a firearm offends the sensibilities of three justices of this court, so they deem it unethical. Allowing subjective feelings to color the construction of the Code subjects Wisconsin's judges to sanctions based on the personal ideals of three or four justices rather than actual breaches of written rules. Unreasonably broad and unexplained constructions of the Code's rules are "antithetical to the rule of law" because "[s]uch rules place ipse dixit powers . . . in the hands of disciplinary boards and courts applying such rules." In re Larsen, 616 A.2d 529, 580-81 (Pa. 1992) (per

---

[48] The majority argues that the Code may prohibit speech that the First Amendment otherwise protects. While that may be true, the Code explicitly requires judges to be "patient, dignified and courteous" to others but has absolutely nothing to say about carrying or displaying a firearm. Majority op., ¶39.

27

curiam), overruled on other grounds by In re Roca, 173 A.3d 1176, 1184 (Pa. 2017). Beyond judicial commission proceedings, "[i]ll-defined and fuzzy ethics rules give detractors a green light to hurl too easily the accusation of ethics violations[.]" Rotunda, Judicial Ethics, the Appearance of Impropriety, and the Proposed New ABA Judicial Code, at 1377.

¶91 The majority replaces our customary method of interpretation with its personal policy preferences, which appear to be grounded in "hoplophobia," i.e., an irrational fear of guns. In so doing, the majority dangerously exercises this court's powers based on dogma, not law. See Robert J. Martineau, Disciplining Judges for Nonofficial Conduct: A Survey and Critique of the Law, 10 U. Balt. L. Rev. 225, 245 (1981) ("It sometimes appears as if particular courts have merely imposed their own moral standards of what is or is not proper conduct. Those who administer judicial discipline should keep in mind that they are not empowered to enforce their personal views of proper conduct for judges[.]"). Adherence to the judicial obligation to apply the text of the law as written ensures neutral and apolitical decision-making, based on the rule of law rather than individual predilection. See James v. Heinrich, 2021 WI 58, ¶23 n.12, __ Wis. 2d __, ___ N.W.2d ___ (quoting Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 61 (2012)) ("Contrary to . . . [a] policy-focused approach, the canons [of construction] serve as 'helpful, neutral guides' and are 'grounded in experience developed by reason and tend to be a better administration of

28

justice than leaving interpretation in each case to feelings of policy on the part of the tribunal.'"). In cases involving political controversy, our obligation to focus on the text is even more compelling. Departures from the text risk the court being viewed as little more than a political institution——a kangaroo court.

¶92 As Justice Louis Brandeis cautioned, "we must be ever on our guard, lest we erect our prejudices into legal principles." New State Ice Co. v. Liebermann, 285 U.S. 262, 387 (1932) (Brandeis, J., dissenting). By recognizing that "a law is the best expositor of itself," courts can faithfully fulfill their function as neutral arbiters. Pennington v. Coxe, 6 U.S. (2 Cranch) 33, 52 (1804). While textualism cannot prevent the incursion of policy preferences into legal analysis——indeed, sometimes the word is invoked as cover for policy-based decision-making——the majority's opinion demonstrates that without textualism, such encroachment is certain.

### III. CONCLUSION

¶93 In its opinion, a three-justice majority untethers judicial ethics violations from the text of the Code. While the majority's decision imposes immediate and unjust consequences on Judge Woldt, it inflicts broader and more insidious damage on the institution of the judiciary. If left uncorrected, it will weaponize the Code as a tool for illegitimate attacks on the judiciary. I dissent from the majority insofar as it disciplines Judge Woldt for his displays of a firearm and innocuous statements, which may have offended the sensibilities

29

of three justices but undoubtedly did not violate the Wisconsin Judicial Code of Conduct.

¶94  I am authorized to state that Justice PATIENCE DRAKE ROGGENSACK joins this concurrence/dissent.

30